Filed 12/29/15  In re R.J. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.J., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. J.J., Defendant and Appellant. | A144970 (Alameda County Super. Ct. No. OJ13020277) |

In this appeal, J.J., mother of R.J., seeks relief from the portion of an April 24, 2015, order denying her Welfare and Institutions Code section 388[1] petition to vacate a prior order terminating her reunification services and scheduling a section 366.26 hearing to terminate parental rights and select a permanent plan for R.J.  We affirm. [2]

---

[1]     All further unspecified statutory references are to the Welfare and Institutions Code.

[2]     In her notice of appeal, mother also asserts she is appealing from the portion of the April 24, 2015 order maintaining May 4, 2015 as the date for the scheduled section 366.26 hearing.  Because that portion of the order has been rendered moot due to the passage of time, the appeal from that portion of the April 24, 2015, order is dismissed.

# FACTS[3]

## A.    Juvenile Dependency Petition Proceedings

J.J. (mother) was 43 years old when she gave birth to R.J. (the child) in December 2012. The child was born under exigent circumstances due to mother's critical heart problems that necessitated heart surgery. In connection with the operation, the child was born via cesarean section. Alameda County Social Services Agency (agency) detained the child on discharge from hospital, at which time the three-week-old child was placed in his current foster home. The agency filed a section 300 juvenile dependency petition, later amended, asking the court to find that the child came within its jurisdiction under subdivision (b) (failure to protect). (§ 300, subd. (b).) The amended petition alleged, in pertinent part, that mother's substance abuse and mental health issues impaired her ability to provide adequate care for the child.

At the January 23, 2013, detention hearing, the juvenile court upheld removal and detention of the child by the agency, and directed the agency to provide services as soon as possible to reunify the child with mother, if appropriate. Mother was ultimately discharged to a medical rehabilitation program on March 6, 2013. She applied for a residential drug treatment program and, in the meantime, she fully cooperated with a methadone program that offered therapeutic services. On March 18, 2013, mother began weekly 2-hour supervised visits with the child.

At a combined jurisdiction and disposition hearing held on April 22, 2013, the juvenile court took jurisdiction and declared the child a dependent of the court after finding true the petition's allegations, as amended, against mother. The agency was granted custody of the child and directed to provide reunification services to mother. The court also directed the agency to arrange for visits between the child and mother as frequently as possible consistent with the child's well-being.

At the six-month review hearing held on October 2, 2013, the juvenile court continued the child's out-of-home placement and mother's reunification services after

---

[3]    We set forth only those facts as are necessary to resolve this appeal.

finding that mother's progress toward alleviating and mitigating the causes necessitating placement had been "partial." The court ordered the agency to arrange for visits between the child and mother as frequently as possible consistent with the child's well-being. The court's orders were based on the agency's status review report that since May 2013, mother had been a participant in a residential drug treatment program. She was sober and taking prescribed methadone daily, but testing negative for illicit drugs and alcohol. Mother reported she was suffering from PTSD, depression and anxiety, attending individual therapy, and had undergone a psychological evaluation.[4] Mother was attending parenting classes and doing great. Mother continued to have weekly supervised visits with the child at the residential drug treatment facility.

At the 12-month review hearing, the juvenile court again continued the child's out-of-home placement and mother's reunification services after finding that mother's progress toward alleviating and mitigating the causes necessitating placement had been "substantial." The court gave the agency the discretion to begin a 14-day trial home visit between the child and mother when the agency deemed it appropriate. The court's orders were based on the agency's status review report that mother was still in a residential drug treatment facility, but she had completed all program requirements and was in the re-entry phase; mother's drug tests were clean except for tests that were appropriately positive for methadone. Mother had applied for transitional housing that would

---

[4]     The psychologist's June 26, 2013, report noted that mother had a long history of drug abuse, with her drug use at its heights in mother's early twenties. Since that time, mother had "been in several" rehabilitation programs and had "completed four out of 10" programs. Mother reported she had been "clean for some time, but relapsed approximately one year ago, using heroin and methamphetamine. Around that time, she used heroin to relieve back spasms from 'two slipped disks,' and attempted suicide; she was unaware that she was pregnant at the time, and learned of the pregnancy when hospitalized" for heart surgery. Mother reported she was in constant physical pain from certain physical conditions, which pain interfered with her ability to sleep and affected her psychological state. The psychologist opined that mother's "chances of relapse were increased because she used drugs to self-medicate," and the nature of some of mother's problems suggested that treatment would be "fairly challenging, with a difficult treatment process and the probability of reversals."

3

accommodate mother and child. Because of mother's serious medical issues, she was working with an occupational therapist and the agency had ordered specialized equipment for mother. Mother had also been placed on a medication regimen that allowed her to sleep and better manage her pain. She was exploring mental health medication to manage her anxiety. Mother was more clear headed and focused, and was working to establish a good relationship and plan for the child's transition to her care. Mother's therapist reported that mother was using therapy well and was making progress. By the beginning of March 2014, mother's visits had increased to two weekly unsupervised visits with the 15-month-old child; one hour on one day and six hours on one day with visits taking place at mother's residential drug treatment facility. Mother was loving, diligent and protective during the visits, and any problems were mostly resolved after consultation with mother's service providers. Mother and child received weekly infant/parent therapy to work on strengthening their relationship. The social worker opined that placing the child in mother's home for a trial visit would allow mother to demonstrate her ability to parent the child for longer periods of time and allow the agency to evaluate what additional support needed to be in place to support mother and child.

However, in the agency's July 2014 status review report prepared for the 18-month review hearing, the agency recommended that the court terminate mother's reunifications services and schedule a section 366.26 hearing for the permanent placement of the 18-month-old child. The agency social worker reported that mother had been drug free for almost 16 months, had completed her residential drug treatment program, and had moved into transitional housing where she had her own house that could accommodate mother and child. Since May 2014, mother was participating in outpatient drug treatment and relapse prevention services, anxiety and PTSD support groups weekly, and weekly random drug tests. However, several major physical health concerns had come to light including mother's prospective heart surgery and treatment for a chronic disease. Also, mother was taking various medications for depression, anxiety, sleep, and pain maintenance treatment. The agency social worker also had some

4

concerns about mother's visits with the child. In March 2014 a transition plan was put into place to allow for the gradual increase in visits with the goal of placing the child in mother's home. Beginning in early April 2014, mother and the child had full day visits twice a week. However, during one visit mother became overwhelmed while caring for the child. So the transition plan was put on hold and the visits were reduced to one full (10-12 hour) day per week. During these one-day visits mother sometimes got tired and overwhelmed, asked for visits to end early, and struggled at times with maintaining the child's cleanliness and routines. Mother's occupational therapist reported that mother had learned adaptive techniques to care for the child but had some difficulties following the techniques. The therapist opined it was difficult to fully assess mother's full parenting capabilities due to her fatigue and heart issues. When questioned by the agency social worker, mother stated she wanted more time with the child and increased visits, but mother expressed concern about her ability to care for the child on a full-time basis. Mother felt she needed more time – up to a year – to address her health conditions and she requested additional reunification services. The agency social worker concluded her report with the following evaluation, in pertinent part: "This is one of the most difficult reports the undersigned has ever had to write. The mother has made tremendous strides in her recovery, her health and her confidence as a parent. She has worked extremely hard on her case plan and is trying very diligently to build a loving, caring relationship with [the] child. The undersigned does not doubt that the mother deeply loves [the child] and that she wants the very best for [the child]. However, the mother is experiencing a host of complicated, significant stressors including: being in recovery after a long battle with substance abuse, depression, anxiety, insomnia, chronic back pain, limited mobility, heart failure, chronic disease, and fatigue. On top of all this the mother is learning to parent . . . and is working to build a relationship with the [child]. If that were not complicated enough, the mother is facing another extensive heart surgery with a lengthy recovery and intensive medical treatment for a chronic disease that will be physically taxing. Additional concerns also exist about the mother's ability to take her medication in a way that is consistent and support[s] her own health and her ability to safely parent.

5

The result of all these challenges and stressors is that the mother is currently not in a position to parent the [child] full time. This has been evidenced during visits, by the mother needing breaks, asking for visits to end early, returning [the child] dirty and having difficulty following routines. [¶] It is unclear to the undersigned whether the mother would be able to safely and consistently parent [the child] if she were given more time to address her health and work on her parenting skills. What is clear is that this would require more than a few weeks or months and a delay of this length is outside the scope of the law, and more importantly, it is not in [the child's] best interest. [The child] has already been in placement for almost 18 months. [The child] has formed a meaningful, significant and loving connection to [the child's] caregivers. The current level of visitation and the stress of the uncertainty of [the child's] situation is taking a toll on [the child's] body and is stressful to the adults in [the child's] life. The stability of permanency is now in [the child's] best interest and will allow [the child] to continue to grow and thrive."

At the 18-month review hearing held on September 22, 2014, the juvenile court continued the child's out-of-home placement and terminated mother's reunification services after finding that mother's progress toward alleviating and mitigating the causes necessitating placement was "partial." The court continued its visitation order directing the agency to arrange for visits between the child and mother as frequently as possible consistent with the child's well-being. The court scheduled a section 366.26 hearing for January 13, 2015 to determine the permanent placement of the child.

In a December 2014 report prepared for the scheduled section 366.26 hearing, the agency social worker recommended that the court terminate parental rights and order a placement plan of adoption. The agency social worker reported that since the last status report, mother continued weekly one-day unsupervised visits with the child and mother and child continued to engage in infant/parent therapy once a week. The child's foster parents reported that on occasion after visits the child was very tired and had difficulty adjusting back to family routines, but they believed the situation would improve with good communications between mother and the foster parents. In her evaluation, the

6

agency social worker stated: "On 3/19/2014, the agency was given discretion by the Court to begin a 14-day trial visit; however, this never occurred as the mother was unable to care for [the child] a full day without contacting the [foster parents] and asking for support. . . . Additionally, on 7/21/2014, [mother] informed [the agency social worker] that she did not believe she could care for [the child] full time. [The agency social worker] notes that it is clear that [mother] loves [the child] and is trying to do her very best for the both of them; however, [mother] is unable to meet [the child's] basic needs on a regular and/or daily basis as well as her own without feeling extremely overwhelmed."

## B. Section 388 Petition Proceeding

On January 6, 2015, a week before the date originally scheduled for the section 366.26 hearing, mother filed a section 388 petition. She asked the court to vacate its prior order terminating her reunification services and scheduling the section 366.26 hearing and issue a new order returning the child to her immediate care and order the agency to provide family maintenance services. In support of her petition, mother alleged the following new information: (1) her health had improved and stabilized and for months she had been having successful weekly 10-12 hour unsupervised visits with the child; (2) she would now have the assistance of three people to assist her with parenting should her health deteriorate; and (3) the child's alleged father, D.B., had agreed to assist her with parenting the child. Mother asserted the proposed new order would be better for the child because the child was attached to mother and alleged father and it would be in the child's best interest to be raised by the child's biological parents. Mother annexed to her petition, a record of mother's attendance in a drug relapse prevention program, two photographs of her holding the child, letters from three women who indicated their ability and willingness to assist mother, and a letter from the child's alleged father who indicated that he was willing to assist mother and if he could not help mother he had three volunteers to assist mother.

Over the course of four months (January 2015 through April 2015), the juvenile court held a hearing on mother's section 388 petition on five days. The court considered

7

the agency's reports prepared for the 18-month status review hearing and for the section 366.26 hearing. Mother testified on January 28, 2015, February 23, 2015, and April 6, 2015.

Mother explained her efforts to reunify with the child. She had completed a 10-month residential drug treatment program including a parenting class in March 2014, and the next month, she had begun and was participating in one-hour weekly out-patient meetings with two substance abuse support groups. While at home, she watched "You Tube" videos concerning parenting several times a week. In her testimony on January 28, 2015, mother initially stated that in the past she had been getting stronger and was able to exercise and ride a bicycle, but a couple of months ago she had a stress test and she was only able to ride a bicycle-type device for eight minutes and just in the past month her breathing was getting worse. She had a scheduled meeting with her surgeon on February 13, 2015 to discuss replacement of two heart valves. When mother resumed her testimony on February 23, 2015, she stated she was still waiting to hear from her surgeon as to whether heart surgery would be necessary. She also claimed that in the past month she had been fine; she had not had any days of weakness or an anxiety attack or a panic attack since last year. She had been prescribed medication for anxiety but she did not take it because it made her sleepy, but if she had a panic attack she would take the medication. When mother resumed her testimony on April 6, 2015, she reported that her physicians had told her she would need heart surgery, but the operation had not yet been scheduled. Mother understood that after surgery, her recovery time would be anywhere from five to eight months; one week in the hospital and then she could have in-home supportive services. Mother admitted that after her last heart surgery in January 2013, it took her about a year to fully recover.

Mother also described her relationship with the child. She had consistently visited with the child throughout the child's life and the visits had been unsupervised except for maybe two months of supervised visits. The child called mother "mommy." Before her services were terminated, there were a number of visits that had ended early because mother was not able to handle the child. She believed things had changed significantly.

8

Since the termination of services at the end of September 2014, she continued to have one full-day (12 hours) weekly unsupervised visits with the child in her home. The child's alleged father D.B. had been present for some part of each visit and mother had not needed him to help because she was unable to care for the child. When asked if she was doing anything differently to make sure that she was not tired during visits, mother said she drank more coffee, "[l]uck, I guess," and she took naps when the child napped during the visit. Mother also testified that a lot of times after visits the child was returned dirty and on one occasion, the child was returned "with Pink Eye," which mother thought the child got from playing with a plunger.

During the course of the section 388 hearing, the agency filed a March 2015 status review report. The agency social worker expressed that she had some concerns about the visits: (1) On December 22 and 23, 2014, the child had back to back full day visits with mother to make up for a visit that would be missed during the holidays. The foster parents reported that when the child was returned they saw the child had a very severe diaper rash that took several days to heal. (2) After a visit on January 12, 2015, the foster parents observed that mother had driven the child home to them and that he was buckled incorrectly in his car seat in mother's car. The social worker went to mother's home on January 26, 2015 asked to see the car seat and observed that the car seat had been installed incorrectly. The social worker showed mother how to properly install and use the car seat. Mother admitted that she knew something was wrong, but she had not consulted the manual or asked another person for support before transporting the child in the incorrectly installed car seat. (3) During a visit on February 2, 2015, mother texted and called the foster parents asking if the child could be picked up early from his visit because mother was not feeling well. The foster parents were not able to accommodate mother and mother was able to make it through the visit.

At the April 6, 2015 hearing, mother testified that during the last few months she had not cancelled visits because of heart-related issues, and the last time she cut a visit off an hour early was several months ago. She also gave explanations of her conduct during some of the visits that were of concern to the social worker as described in the

9

agency's March 2015 report. Mother did not believe it would be traumatic for the child to be immediately returned to her because the child knew her albeit mother admitted the child would miss the foster parents.

As to her plan to care for the child, mother explained that after she became aware of the possibility that she would need heart surgery she sought to arrange for people to take care of the child because "it was asked of" her. About a week or two before the first hearing on the section 388 petition in January 2015, mother asked the child's alleged father D.B. to find people who could help her with the child and he chose people that mother already knew, which was confirmed by D.B.'s testimony. At the April 6, 2015, hearing, mother felt "very confident" that she could care for the child with the help of the child's alleged father and two woman.[5] Mother had also found a child daycare provider who lived four blocks from mother's home.

The agency's social worker Suzan Kotch testified that she had worked for six and a half, almost seven years, in the SEED program, which was a special program for infants and toddlers. Before that time Kotch was a child welfare worker for three and a half years in the family reunification program. She was assigned to the child's case in November of 2013. At that time the child had been in out-of-home placement for almost one year and mother was being provided with reunification services. From November 2013 to March 2014, mother had visits with the child twice a week. Between March 2014 and July 2014, Kotch had attempted to gradually increase visits but mother said she was not ready for all of the planned visits. So the visitation plan was changed from two short visits to one full-day unsupervised visit each week. The visits had not progressed to more than one day a week because issues kept coming up concerning mother's care of the

---

[5] During the hearings on January 13 and 15, 2015, mother called as witnesses three women who testified that they were willing to assist mother. However, at the April 6, 2015 hearing, mother testified that she was no longer relying on two of those women, but would be relying on one of those women and another woman who was not called to testify at the hearing. The child's alleged father D.B. testified that he had arranged for six people, including himself, to assist mother - the two women whom mother testified she was no longer relying on to assist her, the two women mother said she would rely on to assist her, and one man who was not called to testify at the hearing.

10

child or mother saying she was overwhelmed during the visits. The agency never tried again to increase visits because Kotch felt that mother could not "get a good handle" on caring for the child for one full day. Kotch believed mother was overwhelmed based on the following factors: her exhaustion related to her heart condition and back pain, her medications, and her anxiety. After speaking with mother, Kotch understood that mother was still waiting for her surgeon to contact her about heart surgery — which was "imminent" and would have "a significant recovery period" associated with it.

Kotch opined that at the time reunification services were terminated in September 2014, mother was not able to care for the child on a full-time basis. Since services were terminated, Kotch had been present at mother – child visits about once a month (five or six times), and Kotch's opinion had not changed about mother's ability to parent the child on a full-time basis. As to mother's plan to care for the child, Kotch had concerns about whether mother's friends would be "consistent enough" and "really available." Kotch also opined that the child's transition from the foster parents to mother would be very hard and stressful on the child, and multiple strange persons caring for the child would cause further considerable stress to the child. Kotch believed it would be better for the child to remain in the foster care placement for the following reasons: (1) the child had been in the current placement for almost two years and three months, had developed a very significant attachment to the foster parents, and a move from that home would be a very significant loss, trauma and stress for the child, and (2) mother was still dealing with some very significant problems, and mother's circumstances had not significantly changed since September 2014 when reunification services had ended. Kotch acknowledged that mother had made some very tremendous changes in her life, but those changes were not significant enough to allow mother to "really safely parent" the child "in a way that would support [the child's] development and [the child's] mental health," given mother's own ongoing mental health concerns, she was still dealing with substance abuse issues, and she was facing imminent major surgery.

On cross-examination, Kotch confirmed that mother had been "clean and sober" for two years, a substantial amount of time, and that mother had been participating in

11

individual therapy for at least 18 months.  Mother had also been receiving services for assistance with the child for about 18 months, and mother could continue to receive those services if the child was returned to her care.  Mother's location of a specific daycare provider would not make a difference because mother's health situation required round-the-clock coverage including weekends, evenings, and holidays when daycare was closed.  Kotch was still unclear as to what mother's plan would be for those times when daycare was closed, which would require again yet another person and another transition for the child.  Despite the child's visits with mother, Kotch opined that a transition to mother's home would still be a significant trauma and loss as the child would be losing caregivers that the child had lived with full-time for two years.

After argument by counsel, the juvenile court denied mother's section 388 petition. The court noted initially it was not convinced that mother had met her burden of showing a change of circumstances warranting new court orders, "but more importantly," the court found mother had failed to establish that a change in the court's orders would serve the child's best interest.  In reaching its conclusion, the court considered the following factors: "The assembly of additional support persons, those who were remaining and I am including [the child's alleged father] as being among them, does address some significant concerns and it is a change to the extent that these people or this group of people were not available previously from my understanding . . . when the Court terminated reunification services. [¶] But for the exception of [the child's alleged father] who has demonstrated a longer commitment, it would appear that these other people are meant to address the challenges [mother] will face with this anticipated significant heart surgery and the commitment of these people is a little unclear. [¶] I am asked to decide whether or not it warrants a change in the Court's order.  I can't say that that alone does. I've been pointed to improvements in the mother's health and I suppose there are matrixes that one could choose to measure the mother's improvement. . . .  But I note, for example, that back in May of 2014 there was an incident when I believe the mother couldn't find something and she had been riding her bike and had to call the worker and coordinate a pick-up.  I noted that because the mother testified that at this time she's not

12

in a position to ride a bike, so I don't know that her health has improved significantly such that that is a change from the past. [¶] Be that as it may, the Court should comment here that we spent a lot of time talking about the anticipated heart surgery and what that might look like; and if that were the only issue before the Court this would not be such a hard case, but it is not. [¶] As was pointed out in the arguments of County counsel and [the child's] counsel, there are other issues that the Court has to consider on the best interest of [the child]. So my decision today is not a comparison of households. . . . [¶] . . . [¶] I have considered what led to this dependency. The mother had a number of challenges initially. She's done an incredible job addressing many of those challenges, in maintaining her sobriety and she has secured housing and she is working on her health. She has shown real courage. [¶] There was a moment in her testimony when she said . . . even if [the decision] goes against her it won't be because she's not fighting for her child. That's not only true in her words, but it is evident in her actions over the last many months that she has shown her commitment to not only improving her own circumstances but is doing so for [the child]. [¶] Here is the major concern for the Court: It is significant that after many attempts within the last year to return [the child] to the home of the mother which included for a toddler someone under the age of three at the time of removal, the extension of family reunification services out to 18 months, attempts by the Agency to both increase visits or to graduate to a two-week trial visit in-home, all designed to reunify [the child] with [the child's] mother failed. Even with the combined and sustained efforts of the Agency, the mother and service providers were unsuccessful and that shift has remained fixed for a long period of time. [¶] I weighed the mother's successes against this reality as well as the length of time [the child] has been in out-of-home care. [The child] has been with current caregivers since [the child] was a little over two weeks old. [¶] . . . [A]t this time in th[is] dependency proceeding[ ] the focus has shifted to promote [the child's] need for permanency and stability. [¶] In [this] case, [the child's] best interests are not to further delay permanency and stability. In this case, I will admit it is very tempting to want to reward [mother's] courage and her efforts and

hard work; but as counsel said, that cannot be my sole focus in this case." Mother's timely appeal from the denial of her section 388 petition ensued.

## DISCUSSION

Mother seeks reversal of the April 24, 2015, order on the sole ground that the juvenile court abused its discretion in denying her request for relief under section 388. In her opening brief, she argues that she met her burden of establishing a change of circumstances and that the proposed modification she sought would be in the child's best interest as it would promote the child's need for permanency and stability. In her reply brief, she eschews respondent's assertion that she is rearguing the evidence or asking us to reweigh the evidence. Instead, she contends the juvenile court exceeded the bounds of reason when it determined she had failed to prove either a change of circumstances or that the modification she sought would promote the child's best interest. According to mother, the evidence "clearly established" both elements, and thus, the juvenile court's decision " 'transgressed the confines of the applicable principles of law' and amounted to an abuse of discretion." We conclude there is no basis to disturb the juvenile court's ruling on mother's section 388 petition.

The denial of mother's section 388 petition "under our review in this case came late in the proceedings, after the court had found jurisdiction (§§ 334, 355), removed the child from [mother's custody] and placed [the child] in foster care (§ 358), undertaken the six-month, . . . [twelve-month,] and [eighteenth-month] review hearings (§ 366), and concluded that it was unlikely the child could be reunified with [mother] (§ 366.21). The matter was set for a hearing on selection and implementation of a permanent plan (§ 366.26), . . . when [mother] interposed a motion for a change or reconsideration of the earlier placement order. Such a motion may be brought pursuant to section 388 at any time after the [child] has been declared a dependent child of the juvenile court. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 308-309 [19 Cal.Rptr.2d 544, 851 P.2d 826].)" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 316-317.)

"At a hearing on a motion for change of placement [under section 388], the burden of proof is on the moving party to show by a preponderance of the evidence that there is

14

new evidence or that there are changed circumstances that make a change of placement in the best interests of the child.  (§ 388; *In re Audrey D.* (1979) 100 Cal.App.3d 34, 45 [160 Cal.Rptr. 802]; Cal. Rules of Court, rule [5.570(h)(1)].)"  (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.)  However, when a request comes late in the proceeding following the termination of reunification services, as in this case, "the parent['s] interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H., supra*, 5 Cal.4th [at p.] 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  (*Id.*, at p. 302.)  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child."  (*In re Stephanie M., supra*, at p. 317.)  Thus, the juvenile court here "properly focused on the child's interests," instead of mother's interests.  (*Id. at p.* 323.)

Relying on isolated and contradictory portions of the documentary and testimonial evidence presented at the section 388 hearing, mother contends the juvenile court should have found that there were changed circumstances supporting a change in the child's placement, which would promote the child's best interest and need for permanency and stability.  However, as mother concedes, our limited power of review requires us to "accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)  "The juvenile court's opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference.  [Citation.]"  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)  And, as our Supreme Court has "warned:  ' ["]The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." '  (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272 [279 Cal.Rptr. 576, 807 P.2d 418], quoting *Shamblin v. Brattain* (1988) 44 Cal.3d

15

474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339].)" (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318-319).

On this record, we may not and will not interfere with the juvenile court's considered decision. The juvenile court found that mother had not met her burden of demonstrating changed circumstances. Despite mother's arguments to the contrary, given her extensive history of substance abuse and failure to complete rehabilitation programs, the juvenile court could reasonably find that mother's two years of sobriety "against [her] previous failings," did not show sufficiently changed circumstances requiring a change in the child's placement. (*In re Brian R.* (1991) 2 Cal.App.4th 904, 918.) "[M]ore importantly," the juvenile court was obliged to "evaluate the likelihood that [mother] would be able to maintain a stable, sober and noncriminal lifestyle for the remainder of [the child's] childhood." (*Ibid*.) The juvenile court also could reasonably find that mother's lately-presented plan to care for the child was not well-developed or thought-out by mother. This is so especially in light of the fact that mother presented no independent evidence — by way of reports, letters, or testimony of the current service providers, therapists, and other professionals who worked with mother and the child — showing that she was ready to assume custody of the child on a full-time basis with family maintenance services and the assistance of friends and the child's alleged father. As to the child's best interest and need for permanency and stability, the record shows that at the time mother filed her section 388 petition, the child had already spent 24 months in a foster care home. The juvenile court appropriately noted, and the record demonstrates, that mother had not progressed beyond one full-day of unsupervised visitation per week, and on occasion, she spent an additional three to five hours with the child to attend certain specific events. Mother presented no independent evidence that the child's best interest and need for permanency and stability would be promoted by the child's removal from the only home the child had ever known and placed in mother's home. (See *In re Brittany K*. (2005) 127 Cal.App.4th 1497, 1507 [appellate court upheld denial of parent's section 388 petition where there was no "independent evidence that it was in [children's] best interests to be taken from the foster home where they were

making substantial progress and from the foster parents with whom they were in the process of bonding, and thereby deprive them of the stability and permanence of their existing home"]; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808 [appellate court upheld summary denial of section 388 petition where parent presented no independent evidence from therapist or expert showing it was in child's best interest to be removed from the only home and caretakers the child had ever known, and thereby be deprived of the stability of a permanent home, in order to be returned to a parent who remained a risk (based on psychological profile as well as historical patterns) to again regress].) We see nothing in the record or the cases cited by mother from which we can conclude that the juvenile court was required, as a matter of law, to grant her the relief she requested under section 388. Accordingly, we must uphold the denial of mother's section 388 petition.

## DISPOSITION

The appeal from the portion of the April 24, 2015 order maintaining May 4, 2015, as the date for the section 366.26 hearing is dismissed. The portion of the April 24, 2015, order denying mother's section 388 petition is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.

*In re R.J.*, A144970

17